**Alan TRUEX, Plaintiff,**

**v.**

**HEARST COMMUNICATIONS, INC., Texas Newspaper, Inc., and Hearst Newspaper Partnership, L.P., d/b/a The Houston Chronicle, Defendants.**

No. Civ.A. H–99–0664.

United States District Court, S.D. Texas, Houston Division.

May 17, 2000.

G. Scott Fiddler, Attorney at law, Bellaire, TX, for Alan Truex, plaintiff.

L. Michael Zinser, Zinser & Patterson, Nashville, TN, James M. Patterson, Jr., Zinser & Patterson, Nashville, TN, for Hearst Communications Inc., defendant.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

In this Fair Labor Standards Act case, plaintiff, Alan Truex, alleges that his employer, Hearst Newspaper Partnership, L.P. d/b/a/ the Houston Chronicle ("the Chronicle"), wrongfully denied him overtime pay, in violation of section 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, and retaliated against him for asserting his right to overtime pay, in violation of section 15(a)(3) of the FLSA, 29 U.S.C. § 215(a)(3). Truex has sued for injunctive relief, declaratory relief, damages, and attorneys' fees and costs. (Docket Entry No. 1). Defendants[1] moved to dismiss the complaint under Rule 12(b)(6) or, in the alternative, for summary judgment. (Docket Entry No. 12). The parties conducted discovery after this court ordered a continuance under Rule 56(f), (Docket Entry No. 22), and both parties have submitted summary judgment evidence. Defendants' motion is solely one for summary judgment. Based on a careful review of the pleadings, the motion, the parties' submissions[2], and the applicable law, this court DENIES defendants' motion for summary judgment. The reasons are stated below.

## I. Background

The Houston Chronicle is a daily newspaper located in Houston, Texas, with a daily circulation of 541,872 and a Sunday circulation of 736,212. (Docket Entry No. 14, Ex. 1, Pederson Aff., ¶¶ 3–4). The Chronicle is the seventh largest newspaper in the United States. (*Id.*, ¶ 4). The company has 315 editorial employees in six bureau offices, as well as the main office in Houston. (*Id.*, ¶ 5).

1. Defendants Hearst Communications, Inc. and Texas Newspaper, Inc. are general partners of Hearst Newspaper Partnership, L.P., a foreign limited partnership that does business as

2. Defendants have moved to strike plaintiff's response to defendants' reply to plaintiff's response to the motion for summary judgment. (Docket Entry No. 37). Defendants assert

The Chronicle hired Truex as an editorial sports writer on July 7, 1986. (Docket Entry No. 12, Ex. B, Cunningham Aff., ¶ 3). Truex had eight years of experience as a sportswriter, including seven years with the *Atlanta Journal–Constitution*, and a bachelor's degree in journalism from the University of Texas at Austin. (Docket Entry No. 14, Ex. 3).

The Chronicle initially treated Truex as a nonexempt employee, entitled to overtime pay under the FLSA. (Docket Entry No. 1, ¶ 8). On August 2, 1987, the Chronicle promoted Truex to the position of senior sports reporter, although his job duties and salary did not change. (Docket Entry No. 12, Ex. B, Cunningham Aff., ¶ 4; Docket Entry No. 25, Ex. A, Truex Aff., ¶ 3). Upon his promotion, the Chronicle classified Truex as an exempt employee not entitled to overtime pay. (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 3).

In 1994, Truex began covering the Major League Baseball beat. (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 7). He covered the baseball beat with a "beat partner," Neil Hohlfeld, whom the Chronicle also treated as a nonexempt employee. During the baseball season, Truex wrote between five and ten by-lined articles each week on Houston Astros baseball games and related topics. (*Id.*, ¶ 10). From March to the end of September, Truex covered a majority of the Astros' exhibition and regular season baseball games. (*Id.*, ¶ 8). In October, he covered postseason baseball games on a daily basis. (*Id.*). On days during the baseball season that the Astros did not play, Truex or Hohlfeld wrote an "off-day feature," "a report on a specific aspect of the teams [sic] performance, a particular player or other news-

that plaintiff did not seek leave of court before filing that submission and that such a submission is not provided for in the Federal Rules of Civil Procedure nor the Local Rules of the Southern District of Texas. (*Id.*, p. 2). Plaintiff has since moved for leave to file the submission (Docket Entry No. 42). This court GRANTS plaintiff leave to file the submission and DENIES defendants' motion to strike.

worthy development." (*Id.*, ¶ 9). Truex also wrote· a weekly "baseball notebook" article, in which he ranked the Major League Baseball teams and surveyed baseball news from around the league. (*Id.*, ¶ 12).

In July 1997, Truex complained to Dan Cunningham, the assistant managing editor for sports and Truex's supervisor,[3] about the long hours Truex worked on the baseball beat. (*Id.*, ¶ 21). Truex demanded that he be given compensatory time or overtime pay to continue to work the long hours. (*Id.*).

Truex raised the issue again in an October 1997 conversation with Cunningham. Truex surreptitiously tape-recorded that conversation and has submitted a transcript of that tape-recording with his response to the summary judgment motion. (*Id.*, Ex. A4). The transcript discloses that Truex and Cunningham discussed the possibility of removing Truex from the baseball beat and reassigning him to a position requiring shorter hours. (*Id.*, p. 15). Truex mentioned several times that on the baseball beat, he was working more than 40 hours· in certain weeks, without overtime pay. (*Id.*, pp. 16–17). Truex stated that if he had to work such long hours, he wanted either compensatory time or overtime. (*Id.*). The conversation concluded with the following exchange:

> TRUEX: [P]ay me the overtime. A lot of sports writers get overtime. Legally, I'm entitled to it, you know, just pay me the overtime. If the Chronicle won't give me comp time or overtime, I am not afraid to. go to the Labor department and see if the lawyers over there will help me. get the overtime pay. I was in Atlanta when a sports writer over there did that

there, and the Court said, absolutely, the only sports writers who are not eligible for overtime are columnists. Everybody else is, should be non-exempt....

> CUNNINGHAM: I'll let you deal with the labor lawyers on that. As far as I'm concerned you're in an exempt position. Alright. That's what I was told when I came on and that's how I treated you. If you want to contest that then I think you need to take it to labor lawyers. In the meantime, I think we have terminated our conversation.

(*Id.*, p. 17).

After his October 1997 conversation with Cunningham, Truex spoke to a representative from the Wage and· Hour Division of the Department of Labor ("DOL"). (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 24). The DOL representative told Truex that, as a sportswriter, he was entitled to overtime pay. (*Id.*). The DOL representative gave Truex a copy of certain federal regulations to ·show his employer and suggested that Truex talk to his employer once more before filing· a complaint with the department. (*Id.*).

On November 13, 1997, Truex again spoke to Cunningham and again tape-recorded the conversation. The transcript of that tape-recording discloses that Truex told Cunningham about the discussion with the Department of Labor. (*Id.*, pp. 20–21). Truex said that he no longer wanted to be removed from the baseball beat, but did want to be paid as a nonexempt employee. (*Id.*, p. 21). Truex related the DOL representative's advice that Truex was entitled to overtime and showed Cunningham the federal regulations. (*Id.*, p. 21; Docket

---

**3.** Plaintiff has moved·to strike Cunningham's affidavit from the summary judgment record under Rule 56(g), arguing that the affidavit was made in bad faith. (Docket Entry· No. 27). Plaintiff also seeks recovery of the attorneys' fees and costs he incurred in responding to the affidavit. (*Id.*). Plaintiff contends that evidence shows that Cunningham lied several times in his affidavit. After reviewing the

affidavit and the other evidence in the record, this court concludes that the affidavit was not made in bad faith and DENIES the plaintiff's motion to strike and for attorneys' fees and costs. To the extent that statements in Cunningham's affidavit are controverted by other evidence in the summary judgment record, the statements cannot be the basis for a grant of summary judgment against plaintiff.

Entry No. 25, Ex. A, Truex Aff., 26). The transcript of the conversation discloses the following statement by Truex:

[The DOL] said that [before filing a formal complaint], I should talk and meet, I may want to talk with my boss one more time and see if I can get this exemption lifted. They gave me one of these, a copy of this which pointed out, this brochure that there are actually criminal violations, uh, criminal penalties can be assessed, including imprisonment for employers that violate this law. So, they said, what they did is they copied a bunch of pages out of the law books and said I could show these to you, the underlined passages which they felt were applicable to my position. They specifically mentioned that sports events, reporters that covered sports events are not exempt. They pointed that out. So I'm gonna leave this with you and a copy of this uh, criminal code here. And uh, they suggested I fill out some time-slips for overtime and submit those to establish that I am seeking to get this done so I'm gonna leave uh, leave some overtime slips from the post season ... along with my daily logs which show the amount of work that I put in. I'm gonna leave that with you to see if that can be, you know, if you can or want to get my exemption lifted. If not, then, you know, then I want to try to set a meeting with Tony or something before I go and proceed with uh, official complaint or grievance on that matter.

(Docket Entry No. 25, Ex. A4, p. 20–21).

Truex and Cunningham went to talk to Tony Pederson, the managing editor of the Chronicle. (*Id.*, Ex. A, Truex Aff., ¶ 29). Truex told Pederson that he felt he was misclassified as an exempt employee and had been to the DOL. (*Id.*). "Pederson quickly terminated the conversation...." (*Id.*)

Before the end of the work day on November 13, Cunningham told Truex that he would be removed from the baseball beat, but could continue as a reporter in the sports department. (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 27–28, 30). In January 1998, Cunningham offered Truex the horse racing beat, a far less prestigious assignment. (*Id.*, ¶ 30). Truex continued to receive the same salary on his new assignment. (Docket Entry No. 14, Ex. 2, Cunningham Aff., ¶ 15–16).

On March 3, 1999, Truex filed suit in this court. (Docket Entry No. 1). Truex asserts a claim under section 7 of the FLSA, alleging that the Chronicle willfully violated this section by classifying him as an exempt employee and denying him overtime pay. Truex seeks to recover overtime pay from March 3, 1996 to the present. Truex also asserts a claim under section 15(a)(3) of the FLSA, alleging that the Chronicle removed him from the baseball beat in retaliation for his assertion of rights under the FLSA. Truex alleges that his removal from the baseball beat resulted in the loss of outside income that he had previously earned by doing freelance work related to the baseball beat. Truex seeks damages, declaratory and injunctive relief, and attorneys' fees.

Defendants have moved for summary judgment. (Docket Entry No. 12). Defendants contend that, as a matter of law, Truex was and is exempt from the coverage of section 7 of the FLSA as an "artistic professional" under section 13(a)(1) and related regulations. (Docket Entry No. 13, p. 10). In the alternative, defendants argue that any violation of section 7 was not willful and that Truex cannot recover overtime pay owed him before March 3, 1997.[4] (*Id.*, p. 25). As to the retaliation claim, defendants contend that Truex did not engage in any protected activity under

---

4. Section 255(a) of the FLSA, 28 U.S.C. § 255(a), provides, in relevant part:

    Any action ... to enforce a cause of action for ... unpaid overtime compensation ... may be commenced within two years after the cause of action accrued, and every such

    action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

section 15 of the FLSA. (*Id.*, p. 22). Truex responds by arguing that the record does not permit this court to conclude, as a matter of law, that he was exempt as an "artistic professional"; that the Chronicle did not willfully violated section 7 of the FLSA; or that he did not engage in activity protected under section 15 of the FLSA. (Docket Entry No. 25).

These issues are considered below.

## II. The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56. Under FED.R.CIV.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *See id.*

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.1995). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).

"[W]hen a district court denies a motion for summary judgment on the basis that there exist genuine issues of material fact,

the district court is actually making two separate conclusions: 'First, the court has concluded that the issues of fact in question are genuine, i.e., the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party. Second, the court has concluded that the issues of fact are material, i.e. resolution of the issues might affect the outcome of the suit under governing law.'" *Lemoine v. New Horizons Ranch and Center, Inc.*, 174 F.3d 629, 633 (5th Cir.1999) (quoting *Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir.), *cert. denied*, 525 U.S. 1054, 119 S.Ct. 618, 142 L.Ed.2d 557 (1998)).

In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little*, 37 F.3d at 1075 (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

## III. The Section 13(a)(1) Issue: An Exempt Artistic Professional or A Nonexempt Intelligent, Diligent, and Accurate Reporter?

### A. The Legal Framework

Section 7(a)(1) of the FLSA requires employers to pay overtime at one and one-half times the regular rate to employees who work more than forty hours in a workweek. 29 U.S.C. § 207. Section 13(a)(1) of the Act exempts employees occupying "bona fide executive, administrative, or professional" positions from the overtime requirements of section 7. "The [section] 13(a)(1) exemptions are 'construed narrowly against the employer seeking to assert them,' and the employer bears the burden of proving that employees are exempt." *Dalheim v. KDFW–TV*,

918 F.2d 1220, 1224 (5th Cir.1990) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)).

Section 13(a)(1) authorizes the Secretary of Labor to define by regulation the terms used in the section. These regulations are codified at 29 C.F.R. §§ 541.0–541.52. The Chronicle asserts that Truex is an exempt employee as an "artistic professional." The parties agree that, because Truex earned a salary greater than $250 per week at all relevant times, his status should be determined under the "short test" set out in 29 C.F.R. § 541.3(e). It provides:

> [A]n employee who is compensated on a salary basis at a rate of not less than $250 per week ... and whose primary duty consists ... of work requiring invention, imagination, or talent in a recognized field of artistic endeavor, shall be deemed to meet all the requirements of this section.[5]

While the employee's "primary duty" is often the task that occupies the majority of the employee's time, it is not always so. *See Dalheim*, 918 F.2d at 1226. The employee's "primary duty" is "what the employee does that is of principal value to the employer, not the collateral tasks that [the employee] may also perform, even if they consume more than half [of the employee's] time." *Id.*

"[T]he inquiry into exempt status under [section] 13(a)(1) is intensely factbound and case specific." *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1226 (5th Cir.1990). There are three distinct types of findings involved in determining an employee's exempt status:

- findings of historical fact, such as whether a reporter's work is subject to editorial review;
- inferences drawn from applying the interpretations and regulations under section 13(a)(1) to those historical facts, such as "whether a reporter's work is 'original and creative' in character and whether such work is an employee's 'primary duty' "; and
- the ultimate determination whether an employee is exempt.

*See id.* The first is a question of fact; the second a mixed question of law and fact; and the third a question of law. *See id.*

Summary judgment in favor of the Chronicle is proper if, based on undisputed historical facts disclosed in the summary judgment record, the only reasonable inference is that Truex's primary duty consisted of work requiring invention, imagination, or talent in a recognized field of artistic endeavor, so as to make him a exempt employee, not entitled to overtime pay.

The cases applying the artistic professional exception to journalists, while few, are instructive. In *Dalheim*, the Fifth Circuit affirmed the district court's ruling, after a bench trial, that the general assignment news reporters for a Dallas television

---

5. If an employee earns a salary less than $250 per week, the employee's status as an artistic professional is determined under the "long test." The "long test" includes several requirements absent from the "short test":

(1) The long test requires proof that the results of the employee's work depend "primarily" on the employee's "invention, imagination, or talent." § 541.3(a)(2). The short test eliminates the "primarily" requirement and requires only that the [employee's] "primary duty" be "work requiring invention, imagination, or talent in a recognized field of artistic endeavor." § 541.3(e).

(2) The long test requires proof that work be "original and creative in character." § 541.3(a)(2). The short test does not.

(3) The long test requires proof that an exempt occupation require "the consistent exercise of discretion and judgment." The short test does not.

(4) The long test requires proof that exempt work be "predominantly intellectual and varied in character." The short test does not.

(5) The long test contains a quantitative requirement that at least eighty percent of the employee's time be spent on qualifying work. The short test does not.

*See Freeman v. NBC*, 80 F.3d 78, 84 (2d Cir.1996).

station were not exempt from section 7 of the FLSA as artistic professionals. The Fifth Circuit emphasized the district court's findings that station management told reporters what story to cover, what to shoot for the story, and the intended angle or focus of the story. *Dalheim,* 918 F.2d at 1229. The appeals court noted that the day-to-day work of the reporters was "in large part dictated by management." *Id.* The court held that the district court's ruling that the reporters were not exempt, "while not compelled by the evidence, [was] certainly supported by it." *Id.*

Defendants cite *Freeman v. NBC,* 80 F.3d 78 (2d Cir.1996). In *Freeman,* the Second Circuit reversed the district court's finding that a television news writer/editor, a producer, and a field producer were not artistic professionals. The news writer/editor, Freeman, worked for the NBC Nightly News, writing approximately one-third of each broadcast. The court emphasized that "[t]he news writer positions on NBC's Nightly News are among the most highly coveted jobs in broadcast journalism, the pinnacle of the profession." Each day, Freeman received a "blueprint" of the day's newscast, including the subject of each piece and the anticipated format, length, and position in the broadcast. From this blueprint, "Freeman generally developed the scripts without further guidance from other staff members in working to 'create something of a synergy on the words and pictures to tell the story.'" *Freeman,* 80 F.3d at 81. The producer, Brown, worked for NBC Weekend Nightly News. His major responsibilities included "the generation of domestic story ideas for the program; the development, oversight, and approval of domestic stories put together in the field by correspondents and field producers; and the coordination and editing of these stories." *Id.* at 81. The field producer, Garner, worked for the news division of WNBC–TV, NBC's flagship station in New York City. As a field producer, "Garner exercised editorial control over the news stories he produced; he researched facts, developed story elements, interviewed subjects, wrote the script, and supervised the editing of the videotape." *Id.* "At the studio, Garner created segments suitable for airing on WNBC's local news program." *Id.*

The district court had held that the plaintiffs were nonexempt because, although the plaintiffs' work was inventive and imaginative on occasion, their "work was predominantly 'functional in nature,' in that it depend[ed] primarily upon acquired skill and experience and d[id] not depend to a sufficient extent upon invention, imagination or talent to qualify for exemption as the work of an 'artistic' professional." *Id.* at 83. The Second Circuit reversed, finding that "the evidence as a whole plainly demonstrate[d] that the plaintiffs [were] exempt from the overtime provisions as professional employees." *Id.* The appeals court emphasized that the FLSA was "intended, *inter alia,* to prohibit substandard labor conditions," not to provide an unbargained-for benefit to employees like the plaintiffs, "writers and producers at the pinnacle of accomplishment and prestige in broadcast journalism." *Id.* at 86.

Defendants also rely on *Sherwood v. Washington Post,* 871 F.Supp. 1471 (D.D.C.1994) ("*Sherwood III*"), *on remand from,* 871 F.2d 1144 (D.C.Cir.1989) ("*Sherwood II*"), *rev'g,* 677 F.Supp. 9 (D.D.C. 1988) ("*Sherwood I*"). In *Sherwood III,* the district court, after a bench trial, ruled that the plaintiff, a news reporter and bureau chief for the Washington *Post,* was nonexempt. The court entered detailed findings of fact, including that the *Post* management required employees in the plaintiff's position to originate story ideas, to develop a good network of sources and sophisticated interview skills, and to produce writing that was "smooth, distinctive, and concise" and that "contain[ed] original phrasing and imagery." *Sherwood III,* 871 F.Supp. at 1473–76. The court distinguished the duties of an investigative journalist at a major newspaper such as the Washington Post, requiring skill and expertise, from small-town newspaper re-

porting that requires primarily the "gathering [of] facts for ... school lunch menus and wedding announcements." *Id.* at 1482. Based on these findings, the court concluded that the plaintiff was exempt from the coverage of the FLSA as an artistic professional.[6]

Plaintiff relies primarily on two cases finding that news reporters were not exempt artistic professionals: *Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060 (1st Cir.1995) and *Reich v. Gateway Press, Inc.,* 13 F.3d 685 (3d Cir.1994). In *Newspapers of New England,* the First Circuit affirmed the district court's ruling, after a bench trial, that the plaintiff news reporters, editors, and photographers were nonexempt employees owed overtime pay under section 7 of the FLSA. The plaintiffs worked for a newspaper published in Concord, New Hampshire. Although the First Circuit found that the district court had erroneously applied the long test to the three news reporters, the court held that the error was harmless because the reporters were not exempt as artistic professionals even under the simpler short test. The court based its ruling on the following facts shown in the trial record:

> [T]he day-to-day duties of these three reporters consisted primarily of 'general assignment' work. Among other things, their stories covered public utility commission hearings; criminal and police activity; city and state legislative proceedings; business events, including compiling a list of people who had been promoted; and local art events. Rarely were they asked to editorialize about or interpret the events they covered. Rather, the focus of their writing was, as [one of the reporters] phrased it, "to tell someone who wanted to know what happened ... in a quick and informative and understandable way." ... Although some of the work product of

these employees demonstrated creativity, invention, imagination, and talent, their writing did not exhibit these qualities on a day-to-day basis.

*Newspapers of New England,* 44 F.3d at 1075.

In *Gateway Press,* the Third Circuit affirmed the district court's holding that the plaintiff news reporters were not exempt from the coverage of section 7 of the FLSA. The reporters each worked for one of 19 local weekly papers serving the Pittsburgh suburbs. The same printing and publishing company owned all 19 papers. *Gateway Press,* 13 F.3d at 688. After a bench trial, the district court had found that the reporters spent most of their time "rewriting press releases, attending municipal, school board and city council meetings, interviewing people, answering phones, and typing school lunch menus, business reviews, real estate transactions, and church news." *Gateway Press,* 13 F.3d at 699. The Third Circuit affirmed the district court's ruling that the reporters were not exempt as artistic professionals:

> Although [the reporters'] fact gathering duties require intelligence, diligence and accuracy, such duties do not require invention, imagination, or talent.
>
> The bread and butter work of the ... reporters ... is to collect information that is by and large already out in the community and just needs to be combined in a single source. The ... reporters follow up on press releases, attend meetings, interview local officials and record in their articles what they have found. This work does not require any special imagination or skill at making a complicated thing seem simple, or at developing an entirely fresh angle on a complicated topic. Nor does it require invention or even some unique talent in

---

**6.** As the plaintiff points out, the bench trial in *Sherwood III* occurred on remand following the reversal of an earlier district court opinion granting summary judgment in favor of the newspaper. In *Sherwood II,* the D.C. Circuit held that the district court had erred

in granting summary judgment because material facts were disputed, saying that "the parties sharply disagreed over whether Sherwood's reporting [was] original or creative, and whether it [was] predominantly so." *Sherwood II,* 871 F.2d at 1146–47.

finding informants or sources that may give access to difficult-to-obtain information.

*Gateway Press,* 13 F.3d at 700.

Plaintiff also relies on the regulatory interpretations promulgated by the Secretary of Labor, codified at 29 C.F.R. § 541.302(f):

The field of journalism ... employs many exempt as well as many nonexempt employees under the same or similar job titles. Newspaper writers and reporters are the principal categories of employment in which this is found.

(1) .... Exemptions for newspaper writers as professional employees is normally available only under the provisions for professional employees of the "artistic" type. Newspaper writing of the exempt type must, therefore, be "predominantly original and creative in character." Only writing which is analytical, interpretative or highly individualized is considered to be creative in character.... Newspaper writers commonly performing work which is original and creative within the meaning of [section] 541.3 are editorial writers, columnists, critics, and "top-flight" writers of analytical and interpretative articles.

(2) The reporting of news, the rewriting of stories received from various sources, or the routine editorial work of a newspaper is not predominantly original and creative in character within the meaning of [section] 541.3 and must be considered as nonexempt work. Thus, a reporter or news writer ordinarily collects facts about news events by investigation, interview, or personal observation and writes stories reporting these events for publication, or submits the facts to a rewrite man or other editorial employees for story preparation. Such work is nonexempt work. The leg man, the reporter covering a police beat, *the reporter sent out under specific instructions to cover a murder, fire, accident, ship arrival, convention, sport event, etc., are normally performing duties which are not professional in nature within the meaning of the act and [section] 541.3.*

(emphasis added). The interpretations also state that, in determining whether a newspaper employee is engaged in work depending "primarily on ... invention, imagination or talent," the distinction between exempt and nonexempt employees "is similar to the distinction observed ... in connection with the requirement that the work be 'original and creative in character.'" 29 C.F.R. § 541.302(d).

Defendants contend that the newspaper industry has changed dramatically since the Department of Labor interpretations were created. The interpretations are largely unchanged since 1949. They are outdated, reason defendants, and should not be given weight in analyzing the nature of journalists' work today. Defendants correctly note that several courts have questioned the persuasive force of the interpretations as applied to a modern news reporter subject to the short test.

In *Freeman,* the Second Circuit observed that the DOL interpretation "provides guidance strictly for applications of the long test" and had "questionable continuing validity in light of the changing landscape of major, modern news organizations." *Freeman,* 80 F.3d at 84–85. The court noted that the two cases relying most heavily on the DOL interpretations, *Newspapers of New England* and *Gateway Press,* involved small-town reporters, "whose roles closely resemble those of the paradigm 1940's–era journalists." *Id.* at 86. In contrast, the plaintiffs in *Freeman* were " 'writers and producers at the pinnacle of accomplishment and prestige in broadcast journalism,' whose talents far surpass those of journalists who work for local newspapers or smaller television stations." *Id.* (quoting *Freeman v. NBC,* 846 F.Supp. 1109, 1123 (S.D.N.Y.1993)). Similarly, in *Sherwood III,* the district court questioned the applicability of the interpretations to investigative journalists at major newspapers like the Washington Post.

In *Dalheim,* the Fifth Circuit analyzed the weight a district court should accord to

the Department of Labor's interpretations of the FLSA. "The interpretations are not binding authority, for they are not statements of law, but are only 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Dalheim,* 918 F.2d at 1228 (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). "To the extent that a district court finds in the interpretations an analogy useful in deciding the case before it, it may rely on the interpretations as persuasive evidence of both Congress's legislative and the Secretary's regulatory intent." *Id.* "At the same time, should a district court find the concepts expressed inapposite to the facts before it, the court is free to engage in its own interpretation of [section] 13(a)(1) and the pertinent regulations." *Id.* "The persuasive authority of a given interpretation obtains only so long as 'all those factors which give it the power to persuade persist.'" *Id.* (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161). The court stated that "[t]he Secretary's interpretations make it abundantly clear that [section] 541.3(a)(2) was intended to distinguish ... those persons whose work is creative in nature from those who work in a medium capable of bearing creative expression, but whose duties are nevertheless functional in nature." *Id.* at 1229.

The cases and interpretations provide a framework for the analysis required in this case. On one side, *Newspapers of New England* and *Gateway Press* instruct that small-town reporters whose work is primarily to gather and "regurgitate" facts are not exempt from the coverage of section 7 of the FLSA. Such reporters are the modern versions of the "rewrite men" and "leg men" described in the interpretations. On the other end of the continuum, *Freeman* and *Sherwood III* teach that journalists at the top of their profession, who enjoy wide latitude in generating story ideas and in developing those ideas for print or broadcast, with little editorial control, are exempt from section 7 as artistic professionals. In DOL terms, they are the modern versions of "editorial writers, columnists, critics, [or] 'top-flight' writers of analytical and interpretative articles." 29 C.F.R. § 541.302(f)(1). Between these extremes are the reporters such as those in *Dalheim.* Those reporters worked for a local television station in a major city. Although required to exercise some independent judgment, they were subject to substantial guidance and control from management. The Fifth Circuit concluded that the record supported, but did not require, the district court's ruling that the reporters were not exempt.

These cases were not decided on summary judgment. They do, however, provide a background for the inquiry presented by defendants' motion: whether, resolving all factual disputes and drawing all reasonable inferences in Truex's favor, the summary judgment record compels the conclusion that Truex's "primary duty consist[ed] ... of work requiring invention, imagination, or talent in a recognized field of artistic endeavor."

**B. Disputed Issues of Historical Fact and Disputes as to the Inferences Reasonably Drawn From Those Facts**

█ Truex seeks lost overtime damages from March 3, 1996 to the present and seeks declaratory and injunctive relief. From March 3, 1996 until his removal from the position on November 13, 1997, Truex worked as a reporter on the Major League Baseball beat. Most of the evidence in the summary judgment record focuses on Truex's responsibilities during his assignment to the baseball beat.

Truex testified that during the baseball season, his work hours "were dictated by the baseball schedule and deadlines on an almost daily basis." (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 9). During the season, Truex wrote between five and ten by-lined articles per week, as well as a weekly "baseball notebook." (*Id.,* ¶ 10).

While on the baseball beat, Truex wrote three categories of articles. First, he and his beat partner were responsible for cov-

ering the games played by the Houston Astros baseball team. From March to the end of September, Truex reported on a majority of the Astros' 30 exhibition and 162 regular season games. (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 8). During October, Truex covered baseball's postseason on almost a daily basis. (*Id.*). When Truex covered a game, he would arrive at the stadium "at least 2½ hours before the game began, to interview news sources and write news reports and notes about injuries, trades and transactions and other developments." (*Id.*).

The second category of articles Truex wrote during the baseball season was the "off-day feature." Truex wrote such a feature on days that the Astros did not play. On such days, either Truex or his partner would be assigned to write a report on "a specific aspect of the teams [sic] performance, a particular player or other newsworthy development" (Docket Entry No. 25, Ex. A, ¶ 9).

Truex also wrote a weekly "baseball notebook," the third category of Truex's regular stories. The baseball notebook had a four-part format that Cunningham created. (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 12). Truex would write a lead item on a topic he selected. (Docket Entry No. 25, Ex. C, Cunningham Dep., p. 62). The notebook also contained sections titled "Around the National League" and "Around the American League," in which Truex would "pick maybe ten or 12 tidbits, items, from each league and comment on those." (*Id.*). Finally, Truex would rank the teams in Major League baseball, providing "little factoids, trivia type things" about each team. (*Id.*).[7]

The parties dispute the extent to which, in each of the three categories of his work, Truex originated story ideas, had the free-

dom to include his own opinion or analysis in his articles, and could use "poetic license." In his deposition, Cunningham testified that when Truex covered an Astros game, "[i]t was his job to evaluate the Astros, how they had played last night, and it was his job to pick the angle of the story and determine the scope of the story." (Docket Entry No. 25, Ex. C, Cunningham Dep., p. 65). Cunningham testified that as a baseball beat reporter, Truex was required to develop angles on stories and build a network of local and nationwide contacts. (Docket Entry No. 14, Ex. 2, Cunningham Aff., ¶¶ 7, 13). "Truex had to get both behind the news by writing stories that explained the background and get ahead of the news by including in the stories he wrote an analysis and explanation of what may happen in the future." (*Id.*, ¶ 13). In addition to covering the Astros' games, Truex "was responsible for writing about labor issues, legal issues and contractual issues related to the baseball players." (*Id.*, ¶ 7). "These were all general requirements for ... Truex's position." (*Id.*) Although Truex's focus in the daily articles was to cover the game of the day, "no one told ... Truex what to include or exclude in his articles." (*Id.*). Cunningham did not "control how ... Truex decided which stories to pursue or what stories to pursue." (*Id.*, ¶ 13). Cunningham also testified that "Truex was given a large amount of poetic license." (*Id.*, ¶ 7). However, Cunningham admitted that Truex could not be fairly characterized as a "columnist." (Docket Entry No. 25, Ex. C, Cunningham Dep., pp. 66–67).

Truex described a far different picture of his responsibilities and the extent of his initiative and autonomy. In his affidavit, Truex stated that his primary job was to

---

7. The parties dispute the extent of Truex's duties during the off-season while he covered the baseball beat. Cunningham testified that Truex "was free to take large amounts of time off" from work during the off-season. Cunningham stated that from October 26, 1996 to February 1, 1997, Truex worked only every other week and even when working was only

on call. (Docket Entry No. 14, Ex. 2, Cunningham Aff., ¶ 12). Truex disputed this account, testifying that between October 26, 1996, and February 1, 1997, he worked five days each week, with two weeks vacation. (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 47; Exs. C–3 and C–4).

"gather facts and attempt to report them accurately." (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 13). "[A]pproximately 80%–90% of [his] duties on the baseball beat consisted of writing articles about teams, players, and reporting on baseball games." Truex testified that he "was generally not required to originate story ideas." (Id., ¶ 20). Instead, he "was assigned to specific games and events." (Id.). When Truex was assigned to write feature articles, "the topics usually were determined by the sports editor or assistant sports editors." (Id.). Truex testified that Cunningham would usually tell him what topic to cover in the off-day feature. (Id.). Cunningham admitted that he and other editors had a "role" in formulating the "story ideas" that served as a "starting point" for Truex's stories, but testified that Truex "set the agenda for the baseball beat" and had wide discretion in developing the angle, tone, and scope of a story. (Docket Entry No. 25, Ex. C, Cunningham Dep., pp. 48–56; Exs. C–5 and C–6).

Although Cunningham dictated the format of the baseball notebook, Truex determined the content of each particular notebook. (Docket Entry No. 15, Ex. 2, Cunningham Aff., ¶ 8). Cunningham testified that Truex could give his opinion or commentary throughout the notebook and that Truex used "a little bit more poetic license in the notebook." (Docket Entry No. 25, Ex. C, Cunningham Aff., p. 62–63, 65). Truex admitted that the notebook "include[d] some editorial comment and opinion," but denied that it could be "fairly characterized as a column or pure opinion." (Id., Ex. A, Truex Aff., ¶ 12).

Truex also disputed Cunningham's affidavit testimony that Truex alone determined what to include in his articles and that Truex had "poetic license" to write as he chose. Truex recounted several occasions in which Cunningham or other editors criticized him for the angle he had taken in a story, once requiring him completely to rewrite a story. (Id., ¶¶ 17–19). Truex also testified that editors would delete statements of opinion from his articles and that the editorial process "communi-cated to [him] that [he] was expected to keep [his] articles free of editorial comment or opinion." (Id., ¶ 16, 19). Truex submitted examples of editing that showed "Cunningham's extensive control" over Truex's writing style. (Id., ¶ 19). He testified that editors rarely discussed changes with Truex before printing an article. (Id., ¶ 15).

Both plaintiff and defendants submitted articles Truex wrote as examples of his work on the baseball beat. Truex contends that the examples defendants submitted are not representative of his work on the baseball beat, asserting that "[t]he seven articles attached to Mr. Cunningham's affidavit are among the most creative and analytical [he has] written." (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 14). The dates of the articles span a lengthy period. Defendants have not explained how they selected the articles they submitted. Truex has submitted a competing selection, comprising all the sports articles he wrote during the week of September 28, 1997 to October 4, 1997. He asserts that "[t]hese articles represent a typical week of baseball coverage (with the exception that these were written during the playoffs—however, the format is virtually the same)." (Id., ¶ 10). Based on the current record and resolving all inferences in Truex's favor, this court will consider the articles submitted by Truex as Exhibit A2 to his affidavit as a representative sample of his work on the baseball beat.

After reviewing the articles in light of all the record evidence, this court concludes that there are disputed facts material to determining whether Truex's "primary duty" on the baseball beat consisted of "work requiring invention, imagination, or talent in a recognized field of artistic endeavor." Truex was often given "story ideas" to pursue, but he did originate some ideas himself and did, at least to some extent, develop the story ideas given him. The extent of Truex's "license" in his day-to-day work to develop the stories that either he or his supervisors initiated is

vigorously disputed. Although Cunningham testified that Truex determined the angle and tone of his stories, (Docket Entry No. 25, Ex. C, Cunningham Dep., p. 56), a document that Cunningham admitted was "representative" of the story ideas given to Truex shows that editors made detailed suggestions about the structure and, to some extent, tone of assigned stories. (*Id.*, Exs. C–5 and C–6; Ex C, Cunningham Dep., p. 50). Cunningham testified that Truex was required to "get . . . behind the news," (Docket Entry No. 14, Ex. 2, ¶ 13), but admitted that the Chronicle required all its sports reporters, including reporters classified as nonexempt, to "get behind the news." (Docket Entry No. 25, Ex. C, Cunningham Dep., pp. 85–86). The record shows a genuine dispute as to a critical historical fact: the extent to which Truex's work on the baseball beat was "dictated by management." *Dahlheim*, 918 F.2d at 1229.

The game-day articles Truex submitted show that he did more than simply relate the facts of the games he covered. (Docket Entry No. 25, Ex. A2, pp. 6–8, 10). Truex provided some analysis and wrote in distinctive prose. Similarly, the off-day features Truex wrote contain some analysis and display a discernible writing style. (*Id.*, pp. 1–2, 5, 9). The weekly baseball notebook includes analysis, commentary, and attempts at humor. (*Id.*, pp. 3–4). However, the weekly notebook makes up less than twenty percent of Truex's work on the baseball beat. Resolving the factual disputes in Truex's favor, as this court must do in deciding a motion for summary judgment, this court cannot conclude, as a matter of law, that Truex's primary duties required invention, imagination, or talent in a recognized artistic field, rather than requiring only intelligence, diligence, and accuracy, as Truex contends.

The record is less developed as to Truex's duties after his removal from the baseball beat. Almost all of Cunningham's affidavit focuses on Truex's work on the baseball beat. Cunningham did state in his affidavit that after Truex was removed from the baseball beat, he "continued to have the same freedom he had on the baseball beat. He continued to write analytical articles with interesting angles and imaginative prose." (Docket Entry No. 14, Ex. 2, Cunningham Aff., ¶ 16). Truex wrote a long, analytical piece about performance-enhancing dietary supplements. (Docket Entry No. 14, Ex. 2–D). Cunningham admitted that the amount of license given Truex in his current work "depends [on] what he is working on." (Docket Entry No. 25, Ex. C, Cunningham Dep., pp. 52–53).

Truex testified that his description of his duties as a baseball writer "applies equally to [his] job duties after being removed from the baseball beat." (Docket Entry No. 25, Ex. A, Truex Aff., ¶ 13). Truex testified that he now writes between four and six articles each week, as well as a horse racing notebook. (*Id.*, ¶ 11). He stated, "The articles I have written since [being removed from the baseball beat] are analogous to the articles I wrote on the baseball beat, and the horse racing notebook is an analogous notebook (though not lengthy)." (*Id.*, ¶ 13). Truex submitted the articles he wrote for the Chronicle during the two-week period between August 17, 1999 and August 29, 1999, asserting that "[t]hese articles (and one notebook) are typical of the type of writing [he is] currently doing and [has] been doing since [he] was taken off the baseball beat." (*Id.*, ¶ 11).

As to Truex's duties after his removal from the baseball beat, this court concludes that, as with his duties on the baseball beat, there are fact issues as to the extent of editorial control over his work. Reviewing the articles Truex submitted as Exhibit A3 to his affidavit in light of the summary judgment record and resolving the factual disputes in Truex's favor, a reasonable factfinder could find that Truex's primary duties since his removal from the baseball beat do not require invention, imagination, or talent.

This court DENIES the defendants' motion for summary judgment as to Truex's claim for overtime pay.

Defendants also moved for summary judgment on the issue whether any section 7 violation was willful. If Truex ultimately proves a willful violation, he will be able to recover overtime pay due him dating three years back from March 7, 1999, the date he filed this lawsuit. If he proves a violation that was not willful, he may recover overtime pay for the two years before filing suit. *See* 28 U.S.C. § 255(a). Because this court previously granted plaintiff limited discovery under Rule 56(f) to permit him to respond to the threshold issue of the existence of a section 7 violation, plaintiff has not yet had an opportunity to take discovery on the willfulness issue. This court DENIES defendants' motion as to willfulness, WITHOUT PREJUDICE. Defendants may submit a new motion for summary judgment on the willfulness issue after a reasonable opportunity for discovery on that issue.

## IV. Truex's Retaliation Claim

■ Truex asserts a claim under section 15(a)(3) of the FLSA, alleging that Cunningham removed him from the baseball beat in retaliation for his claim of entitlement to overtime pay. The narrow ground of the Chronicle's motion for summary

judgment on this claim is that Truex had not engaged in protected activity under section 15(a)(3) before the adverse employment decision he challenges.[8].

Truex did not file a formal complaint initiating administrative or legal action. Instead, he complained to Cunningham that he was entitled to overtime and sought advice from the Department of Labor informally

Section 15(a)(3) of the FLSA provides:

[I]t shall be unlawful for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee....

Although the Fifth Circuit has not yet considered the question, several circuits have addressed whether an informal complaint of FLSA violations to a supervisor is activity protected from retaliation under section 15(a)(3). The Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have held that an oral, internal complaint is sufficient to trigger the protection of section 15(a)(3). *See EEOC v. Romeo Community Schools,* 976 F.2d 985, 989–90 (6th Cir.1992); *Bren-*

8. In their reply to plaintiff's response to the motion for summary judgment, defendants also asserted that the summary judgment record shows that Truex asked to be removed from the baseball beat and that his removal was not causally connected with his informal complaints about FLSA violations. (Docket Entry No. 30, pp. 16–19). Plaintiff has moved to strike defendants' reply to the extent it asserts a new ground for relief on the retaliation claim and to the extent it discloses additional evidence that was not included in the motion for summary judgment. (Docket Entry No. 33). Defendants' reply does assert a ground that was not included in the motion for summary judgment. This court previously granted plaintiff limited discovery under Rule 56(f) for the purpose of responding to defendants' motion for summary judgment, filed only one month after the answer. This court denied plaintiff discovery on the retaliation issue because "the threshold issue relating to

retaliation raised by defendants' dispositive motion turns on plaintiff's own conduct in challenging the failure to pay him overtime, not defendants' mental state." (Docket Entry No. 22, p. 4). The record discloses that during Cunningham's deposition, defendants' objected to questions about the retaliation claim as beyond the scope of this court's order. (Docket Entry No. 25, Ex. C, Cunningham Dep., pp. 110–11). This court GRANTS plaintiff's motion to strike the additional ground asserted in the defendants' reply, and GRANTS plaintiff's motion to strike the additional evidence submitted with defendants' reply as to Exhibits 1–3 because plaintiff had no opportunity to take discovery and respond to this evidence. This court DENIES the motion as to Exhibit 4 and Exhibit 5, which are highlighted copies of evidence plaintiff submitted in his own response to the motion for summary judgment.

*nan v. Maxey's Yamaha, Inc.,* 513 F.2d 179, 181 (8th Cir.1975); *Lambert v. Ackerley,* 180 F.3d 997, 1002–08 (9th Cir.1999) (en banc); *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1394 (10th Cir.1997); *EEOC v. White & Son Enterprises,* 881 F.2d 1006, 1011–12 (11th Cir.1989); *see also Valerio v. Putnam Assocs. Inc.,* 173 F.3d 35, 40–43 (1st Cir.1999) (holding that section 15(a)(3) protects an employee who has "lodged a written internal complaint with his or her employer but has not filed a judicial or administrative complaint"). Only the Second Circuit has held otherwise. *See Lambert v. Genesee Hosp.,* 10 F.3d 46, 54–56 (2d Cir.1993) (holding that "[t]he plain language of [section 15(a)(3) ] limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor.").

This court follows the majority view. Courts have observed that the language of section 15(a)(3), prohibiting discrimination against any employee who has "filed any complaint ... under or related to this chapter," plausibly extends to complaints "filed" with employers. *See Lambert,* 180 F.3d at 1004; *Valerio,* 173 F.3d at 40–42. The Supreme Court has stated that the provisions of the FLSA are "remedial and humanitarian in purpose" and "must not be interpreted or applied in a narrow, grudging manner." *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944). To exclude employees' internal complaints of FLSA violations from the protection of section 15(a)(3) would discourage employees from attempting private conciliation with their employers. *See Valerio,* 173 F.3d at 43. Under such an interpretation, employees would have to initiate judicial or administrative action before even talking to their employers in order to gain protection from reprisal.

In this case, Truex complained about overtime pay to his supervisor on several occasions, specifically claiming at least twice that the Chronicle's failure to pay him overtime was against the law. Truex informally presented his grievance to the Department of Labor. The DOL representative suggested that Truex try again to resolve the matter without initiating formal proceedings and gave Truex printed copies of pertinent regulations to show his employer in an effort to resolve the dispute without formal proceedings. Truex told Cunningham, his direct supervisor, about his discussion with the DOL representative, showed him the regulations he had been given, and asked for a meeting with the managing editor of the paper to discuss the issue.

Under these facts, it would be particularly inappropriate to deny Truex the protection of section 15(a)(3) because he did not file a formal complaint. Truex did seek the guidance of the Department of Labor; the DOL representative advised him to try to resolve the matter with his employer before filing a formal complaint. This circuit has noted that effective enforcement of the FSLA can "only be expected if employees [feel] free to approach officials with their grievances," *Donovan v. Square D Co.,* 709 F.2d 335, 338 (5th Cir. 1983) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960)), and that "the long-term effect and primary purpose of anti-retaliation suits [under the FLSA] is to promote effective communication with federal authorities." *Donovan,* 709 F.2d at 338.

In light of the language of section 15(a)(3), the purposes the section serves, and the Supreme Court's directive to interpret the FLSA broadly, this court concludes that Truex engaged in activity protected from retaliation under section 15(a)(3) even though he did not file a formal complaint. This court DENIES defendants' motion for summary judgment as to Truex's retaliation claim.

## V. Conclusion

This court DENIES defendants' motion for summary judgment. As to the willfulness issue, the motion may be reasserted

following a reasonable opportunity for discovery on the issue.