Lonnie M. WOODRUM,
Plaintiff-Appellant,

v.

SOUTHERN RAILWAY COMPANY,
Defendant-Appellee.

No. 83–8722.

United States Court of Appeals,
Eleventh Circuit.

Jan. 15, 1985.

Rehearing and Rehearing En Banc
Denied Feb. 22, 1985.

F. Kennedy Hall, Macon, Ga., for defendant-appellee.

Before HENDERSON and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge:

This appeal presents for our review a summary judgment by the United States District Court, 571 F.Supp. 352, for the Middle District of Georgia holding that the court has no subject matter jurisdiction over a suit by Woodrum, a former railroad employee, to set aside the order of Public Law Board 1261, by which he was dismissed from employment with Southern Railway Company (Railway). Our jurisdiction is under 28 U.S.C. § 1291. The principal, though not the sole, issue was whether proffer by the Railway of statements of a witness, subsequently recanted, were of the class or kind of fraud constituting an instance of "fraud or corruption by a member of the division making the order" within the meaning of 45 U.S.C. § 153 First (q). Upon carefully reviewing that witness' statements before the board and his subsequent recanting statement, and the context of the entire case, we conclude that the Railway's actions were not such an instance, no actual misconduct by such member being alleged. Others of appellant's contentions are also without legal merit. Accordingly, there was no issue of material fact and the suit was properly dismissed. We *affirm.*

## Facts

Plaintiff-appellant Woodrum was and had been since 1965 an engineer who operated trains on the Southern Railway. On April 27, 1978, defendant-appellee, by its Superintendent, L.H. Smith, Jr., served on appellant a notice to attend an "investigation" in which he was told appellee would "investigate" on May 1, 1978 a charge of

Mitchel P. House, Jr., Susan S. Cole, E.S. Sell, Jr., Macon, Ga., for plaintiff-appellant.

* Honorable Philip Nichols, Jr., U.S. Circuit Judge    for the Federal Circuit, sitting by designation.

"conduct disloyal and unbecoming an employee" in arranging for a fellow employee, Eddie Lee Robinson, to meet with an attorney, Frank Burge, for the purpose of having Robinson retain Burge to sue the Railway for an injury under the Federal Employer's Liability Act (FELA), and also that he personally took Robinson to meet with Burge about March 15 to discuss the case. The carrier then apparently was incensed about its employees acting as runners to solicit retainer of attorneys in such cases, and viewed it as a heinous offense. This view is not in dispute and apparently was well understood, so the subsequent proceedings were conducted on the common assumption that if Woodrum had done as alleged, dismissal from employment was the appropriate penalty. However, no provision of any collective bargaining agreement or rule of the Railway is cited, and apparently the carrier relied on its inherent or implicit rights as an employer.

The "investigation" was conducted with Superintendent Smith presiding, May 8, at the Ramada Inn, Macon, Georgia. It appears to have been more than an ex parte investigation but less than a full evidentiary hearing. It was recorded by tape, but witnesses were not sworn. Woodrum had representatives of his union present who, being apparently laymen, defended him as best they could, and were allowed to call and question witnesses. We go into the testimony in more detail than did the court below, or the parties in their briefs. The presiding officer appeared interested in developing all the facts, and excluded little or nothing anyone wished to present.

The attorney, Burge, had been invited to be present, but excused himself. He is a lawyer who specializes in FELA cases and has offices in Birmingham, Alabama, but apparently practices in Georgia also. He submitted a written statement exculpating himself from any misconduct. There were three witnesses who were present and testified, who are major figures in the fraud issue. Others of slight importance are mentioned further on.

W.B. Piper identified himself as a claim agent for the Southern Railway. His duties included investigating personal injuries to employees and, if settlement was warranted, to settle with them on a fair and reasonable basis. He had investigated two recent injuries to E.L. Robinson, a switchman, the second of which occurred on March 9, and having settled the first earlier, he formally settled the second April 5. But before settling, Robinson displayed to him a letter from Burge, dated March 23, setting up an appointment for him to see doctors in Birmingham, Alabama, and for air transportation to that city. Robinson said he did not know Burge. On April 20 Piper received word Burge had, on April 6, filed a suit on Robinson's behalf against the Railway. He told Robinson of this and that Burge apparently had a written retainer, but Robinson said he had signed only a medical form. On being asked who got him involved with Burge, Robinson said it was Woodrum. Woodrum had called him on the telephone and said Burge was going to be in Macon, Georgia, at the Hilton Hotel the next day, and Robinson should see him. "I've been hurt before on the railroad and I know what kind of hassle that they can give you." Robinson then told Piper he went to the Hilton and was met in the lobby by Woodrum who took him to Burge and prompted Burge in the discussion of Robinson's injuries that followed. Burge gave Robinson his calling card. After this meeting, Woodrum walked down the hotel corridor with Robinson, asked for the calling card, and wrote his own name and telephone number on the back of it so Robinson could let Woodrum know if he needed anything before Burge contacted him again. The card was produced before Smith, and Woodrum's signature authenticated.

On April 24 Robinson sent Burge a letter avowing he had never retained Burge to bring a suit for him. But this disavowal is incredible in light of the actual retainer contract, which was in evidence, and a tape of his conversation with Burge.

Robinson, however, took the stand. In general he adhered to the story he told Mr.

Piper, as had been recounted by Piper. He asserted or tried to make it appear he signed the retainer contract being induced by Burge's trick to believe he was signing two similar papers, the one on top being an authorization to doctors to divulge information about him. He said Burge's questions indicated he already knew about Robinson's injuries.

Woodrum testified that on March 8 he was doing some yard switching, *i.e.*, shuttling a train about the yard, in course of which he heard that Robinson had to have a relief. March 14 he heard Robinson was hurt. The next day he called Robinson on the telephone and asked if he had done anything to cause the injury. Robinson said no—that he had lost about 3 days—and he recounted efforts to see Mr. Smith. Woodrum continued—

> I said Mr. Robinson I cannot tell you what to do about it—I'm no attorney—my attorney will be in town and he would be glad to talk to you. He said who is he Mr. Burge. I said that's right. He said where's he gonna be at. I said the Hilton Hotel about 2:30 this afternoon.

He denied meeting Robinson in the lobby or conducting him to Burge's hotel room, saying Robinson walked into the room where Woodrum and others already were. He called minor witnesses Nobles and Reid to corroborate this. He admitted he had referred other persons, members of his union, to Burge, but denied that Burge gave him any remuneration for doing so. He *told* Robinson to be at the Hilton at 2:30.

On the basis of this investigation, Superintendent Smith found, by letter May 16, 1978, that Woodrum was guilty of both charges made against him, *i.e.*, of arranging the meeting of Robinson with Burge, and of personally conducting Robinson to a hotel suite to have the meeting. On September 15, 1978, General Manager Moore analyzed the record, affirmed the dismissal, and declined the appeal.

On July 30, 1979, Public Law Board No. 1261, passing judgment on the union's appeal on Woodrum's behalf, said there was "sufficient substantive evidence of proba-

tive value" that "claimant was acting as agent for a personal injury attorney specializing in cases against railroads under the [FELA] and attempted, by subterfuge, to persuade an allegedly injured employee (not a member of Claimant's organization) to retain attorney to sue Carrier." It will be noted these are not exactly the charges made by Smith, but no issue of that is made here. The discrepancy however does throw light on the care exercised by the board in reviewing the record, which of course included the charges as served. The board further recited that participation in such industrial "ambulance chasing" is contrary to the carrier's interests, patently disloyal, and could not be tolerated. They conceded there might be conflicts in the testimony, but they did not, they said, try facts and weigh evidence. Their mandate was clear: to deny the claim if there was "substantive evidence of probative value to support the charge." There is also no issue whether this is a proper assessment of the board's functions, and we assume it is for purposes of this case.

Approximately June 15, 1979, Robinson too lost his job with the railroad. May 20, 1980, he provided a sworn Question and Answer statement to Burge. In this statement he acknowledges that he signed the retainer contract knowingly and not by trick, and that he went to the room at the Hilton by himself and not conducted by Woodrum.

Some time after that meeting, the statement continues, he had a conversation with a Ralph Fussel who told him there was a possibility of his losing his job. (Though Fussel is not identified in this statement, a Ralph Fussel participated in the proceedings before Superintendent Smith as representing Robinson's union.) Fussel further said to get out of his dilemma he should cooperate with Piper. He saw Piper, who also said his job was in jeopardy. Piper dictated a letter for Robinson to write Burge, the letter denying that Burge was retained. He also made a statement as Piper dictated. Piper told him to say Woodrum "took you [Robinson] down to

the hotel," which was not true. In short, he repudiated much he had said that was damaging to either Woodrum or Burge, and imputed all of it to Piper's dictation.

Finally, at the end of the statement, Robinson said—

I've been in a mental institution from pressure behind this—College Street Hospital in Macon, Georgia—it was between September or October of ——'79.

Piper was alive at the date of this statement, but died shortly thereafter. This lawsuit followed. Jurisdiction was asserted on several grounds, some of which are no longer urged here. District Judge Owens was obviously disturbed by the case, and granted summary judgment to the defendant Railway only after several rounds of argument and supplemental briefing. This appeal followed.

### Discussion

The "Public Law Board," whose decision we are asked to overturn, is so-called because it was established under the terms of Pub.L. No. 89–456, 80 Stat. 208, approved June 20, 1966. This Act amends 45 U.S.C. § 153 by enabling carriers and unions, whose "minor" disputes were previously referable to the National Railroad Adjustment Board, instead to agree upon special boards to be made up of one carrier designee, one union designee, and a neutral third person to be selected by the first two. 45 U.S.C. § 153 Second. Awards by board majorities shall be "final and binding" and "conclusive on the parties." However, in accordance with 45 U.S.C. § 153 First (q), parties aggrieved may secure judicial review in certain circumstances, though the decision under review is "conclusive." They may file a petition for review in any United States District Court in which a petition for enforcement could have been filed. The board is to file the record of its proceedings. The court is empowered to set this board order aside in whole or in part, or to remand for further proceedings. On such review—

The findings and order of the division [special board in this case] shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.

And by express provision, the usual appellate jurisdiction of courts of appeal, and the certiorari jurisdiction of the Supreme Court, are made applicable to such cases.

The Supreme Court considered these provisions in *Union Pacific Railroad v. Sheehan*, 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978), and stressed the importance of applying them according to their terms in order to effectuate the object Congress had in mind, to confine "minor disputes" to the boards set up for the purpose under section 153.

Senate Rep. No. 1201, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad.News 2285, provides more light as to the meaning and purpose of this legislation. It is to eliminate a large backlog of claims pending before the National Railroad Adjustment Board, to expedite disposition of grievances and disputes, and to provide equal access to judicial review by employee and employer. Two divisions of the board above-mentioned are stated to be badly backlogged, the First Division to the astounding figure of 7½ years work.

As regards judicial review, this report says that under existing law the railroad, if it lost before the board, could obtain judicial review simply by refusing to comply, necessitating a petition for enforcement. But if the employee lost, no judicial review was available. The committee wanted equal access for both sides. Also, it considered the procedure, both originally and under the proposed amendment, to be essentially for arbitration, and the grounds therefore should be no more than those "commonly provided for review of arbitration awards." Senate Rep. No. 1201, *su-*

*pra,* at 3, *reprinted in* 1966 U.S.Code Cong. & Ad.News at 2287.

Finally, the committee says it considered a proposal for review under the "arbitrary and capricious" standard, but rejected it out of concern that such a provision would be regarded as an invitation to the courts to treat any award with which the court disagreed as arbitrary or capricious. The committee assumed, however—

> that a Federal court would have the power to decline to enforce an award which was actually and indisputably without foundation in reason or fact, and the committee intend[ed] that, under this bill, the courts will have that power.

*Id.*

Woodrum asserts in effect that the committee in the legislative history added a fourth to the three statutory grounds for which a district court could set aside an award. He says that the award was based wholly on false testimony, that of Piper and Robinson, and that an award based wholly on false testimony is actually and indisputably without foundation in fact.

The assumption that the committee used the legislative history to amend the statute by adding a fourth ground is one not borne out by authority binding in this circuit. According to the interesting discussion of the instant statute and legislative history in *Brotherhood of Railroad Trainmen v. Central of Georgia Railway,* 415 F.2d 403 (5th Cir.1969), *cert. denied,* 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970), the alleged fourth ground was most likely intended to interpret and explain the second. *See also Diamond v. Terminal Railway Alabama State Docks,* 421 F.2d 228 (5th Cir.1970). The committee had in mind the rule in labor dispute arbitration that the award, to be valid, must be based on or flow out of the collective bargaining agreement to be construed, and not on any extrinsic facts or issues, because otherwise it is beyond the arbitrator's authority or jurisdiction. Thus, the committee was really proffering its interpretation of the second ground. The board, however, certainly had authority to believe some witnesses and

disbelieve others, and by not prescribing a "substantial evidence" standard of review, Congress made clear that such choices were within the board's jurisdiction only, not the courts'.

We have here, despite unusually dramatic circumstances, a typical case of a recanting witness. There always remains, and does here, a choice for the fact-finder whether the new recanting statement is true, or the former recanted one, or both or neither. Thus, contrary to Woodrum's supposition, the recanting statement does not *per se* establish that the recanted statement was false. Moreover, Piper did not recant his testimony before he died, and it must be taken as still standing. Robinson went, as the case wore on and the pressures grew, into more and more extravagant charges against others to explain his own lack of principle. He made wild charges of unethical conduct against Burge, which Burge demolished because he was still around to do so. The 1980 statement makes equally wild charges against Piper, but Piper not being around any more, no trier of fact will ever know whether Piper's testimony was or was not false. Robinson's latest statement certainly discredits Robinson. It does not, however, discredit those parts of Robinson's testimony which were corroborated by Woodrum himself, *i.e.,* that he telephoned Robinson about the case and in the ensuing conversation, the name of Burge came up. Also it, with the rest of his statements, throws doubt on the wisdom and good faith of the Railway in proffering Robinson as its witness. The record assembled by Smith embodies Burge's refutation of Robinson's charges against him, which ought to have been noticed by the Railway as a timely warning that something was wrong with Robinson as a witness.

However, most recanting witness situations involve, more or less, charges against the side that proferred originally the now recanted testimony. Such charges are necessary to excuse the recanting witness from initially having testified falsely. A witness recantation is far short of the utter

want of foundation in fact that strips the award of its finality. Not only is a mere recantation ineffective to do that, because it still remains to be decided whether the original or the recanting testimony is true, but to give it that effect would be destructive of the summary and expeditious handling and finalization of cases that the committee wished to bring about. Any loser before the board would be given a strong incentive to put pressure on a weak witness and get him to recant.

■■■ We hold, therefore, that the recantation of a witness, associated with charges by him against the side that originally proffered his testimony, even if taken as true on summary judgment, as the district court took it, does not suffice to establish that a board which acted in reliance on his original testimony did so outside the scope of its jurisdiction. We further note that the committee quite intentionally enhanced the summary nature of the dispositions to be made of "minor" disputes, and consequently the powers of the boards. If this might at times result in dispositions unfavorable to workers where a more leisurely disposition might have safeguarded their rights better, this was a trade-off in a statutory package that secured important new rights for them, as the Supreme Court points out in its case cited above. We say this, not to praise the 1966 legislation, but to explain the reasoning by Congress that led to its enactment.

The other leg of appellant's reasoning is that the board member for the carrier being an agent of management, fraud by the carrier might be imputed to him. We note that appellant introduced nothing to show that the member knew or should have known of the misconduct by Piper which is now relied on. Appellant's reasoning would make meaningless the statutory language limiting the right to reopen to cases of "fraud or corruption by a member." This is a somewhat unusual qualification as it is more usual to allow reopening without such a limitation in case of any kind of fraud generally. *See, e.g.,* 19 U.S.C. § 1521 and 41 U.S.C. § 321. The parties

cite only one case, *Merchants Despatch Transportation Corp. v. System Federation No. One Railway Employees Dept.,* 447 F.Supp. 799 (N.D.Ill.1978), and this gives full effect to the apparent intended distinction and thus supports our conclusion. It might be argued the result should be different if the member knew or should have known that the case he was there to support was tainted by fraud, even if he did not personally participate. There is nothing to suggest that this is such a case. If Piper actually did what Robinson says he did, it would be likely he would conceal his misdeeds from his own company as well as outsiders. As we have already noted, the record that went to the board included material establishing that Robinson had actually retained Burge, and his attempt to show the contrary was false. There is nothing to show that anyone called this material to the carrier representative's attention, and he obviously, by his findings, if naively, believed that Burge had got Robinson's signature to the retainer contract by trick, absurd as such an act by Burge would have been. None of this amounts to fraud, though we cannot give very high marks to the care of the carrier's personnel in making up this record.

By the same token, Woodrum was satisfied to be represented by law union officials, though he understood the need for skilled counsel in prosecuting his FELA claim. In this case, far more important to him as it was, he evidently did not realize his need. At any rate, the Burge material that rightly used might have torpedoed the whole case against Woodrum, lay in the record and was innocently submitted to the board. The whole case points to ineptitude or carelessness rather than fraud, on both sides.

■■ Woodrum also cites Fed.R.Civ.P. 60(b) as a grant of authority to the district court to reopen this case for fraud, even if it is not fraud by a board member. The portion relied on is the sentence that the rule does not limit the power of the court to entertain an "independent action"—or "set aside a judgment for fraud upon the

court." The practical effect of this clause is to lift the bar of *res judicata* in certain cases. But the new "independent action" must be one of which the court has jurisdiction otherwise than pursuant to Rule 60(b) itself, for by its terms the Rule only preserves otherwise existing jurisdiction, but does not create it anew. *Bankers Mortgage Co. v. United States*, 423 F.2d 73 (5th Cir.), *cert. denied*, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970); *Andrade v. United States*, 485 F.2d 660 (Ct.Cl.1973), *cert. denied*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974); *Carney v. United States*, 462 F.2d 1142 (Ct.Cl.1972). Appellant argues that jurisdiction can be found in the court's diversity of citizenship or federal question jurisdiction. Whatever validity this may have in other contexts, we do not think it suffices to nullify careful circumscriptions written by Congress respecting the specific subject that the court must deal with. Rule 60(b) cannot be used, as Woodrum wishes, to bootstrap the district court into jurisdiction it would not otherwise have. Congress could not have intended to enact the finality it did for board decisions only to have finality sidestepped by any artful pleader. The review jurisdiction is what was enacted and no more.

■ The next and final point meriting discussion invokes 45 U.S.C. § 60, a criminal statute which voids any contract, rule, regulation, or device intended to prevent employees of a common carrier from furnishing, "voluntarily," information to a person in interest—

as to the facts incident to the injury or death of any employee.

Any violation is punishable by a fine of not over $1,000, or imprisonment of not over one year. This is part of a portion of the U.S.Code relating to liability of railroads to employees for bodily injury or death, the FELA. As a criminal statute, section 60 should be construed strictly, and so construed the information thus to be furnished voluntarily consists of facts relating to death or injury. Some of the information or prompting allegedly furnished Burge by Woodrum possibly might come under this provision, but the charges under which Woodrum was discharged do not. These were, to repeat, arranging for a meeting between Robinson and Burge for the purpose of having Robinson retain Burge as counsel in a suit against the carrier, and personally taking Robinson to the hotel suite to meet with Burge. This is not protected conduct under the terms of section 60. Woodrum argues—

By its procurement and presentation of false testimony in order to support a charge of "industrial ambulance chasing" against Woodrum, Southern made it known that it would attempt to block the access of employees who might bring a FELA action to information necessary to frame their claims.

No reference to the record is offered to show that Southern actually said in any form of words, express or implied, that it would discipline employees who engaged in protected conduct. The way it framed the charges would suggest to the ordinary mind that by negative inference, at least, it said the contrary. Burge himself, in justifying his right to be recommended by railroad employees to fellow employees, did not rely on section 60, but on *Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar*, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), authority which is not relied on here. It sanctions the maintenance of recommended lists of attorneys by the union as a concerted activity protected by the first and fourteenth amendments. While Woodrum was a union member and officer, and the union maintained such a list, according to the record, Burge was not on that list, and Robinson was not a member of the same union as Woodrum.

As the conduct for which Woodrum was disciplined is not protected by the statute, it is unnecessary to consider the limitations question discussed by counsel and by the court below.

*Conclusion*

■ The motion for summary judgment was properly granted because appellee was

entitled to judgment as a matter of law and there was no triable issue of fact. There is no doubt a fact question whether Robinson's original testimony in the investigation or his recanting statement, are the true ones, so far as they differ. But no possible resolution of that question by trial would develop an adequate jurisdictional basis for the court to set aside or remand the Order of the Public Law Board, in view of the very strict definitions by Congress of the grounds on which such actions may be taken. Federal R.Civ.P. 60(b) does not supply jurisdiction otherwise lacking, nor is the result changed by recourse to 45 U.S.C. § 60. A court not having jurisdiction of the subject matter does not have jurisdiction to remand the case to an administrative tribunal believed to have such jurisdiction. The only thing that court can do with such a case is to dismiss it. *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). A statute may add the option to transfer the case to a court having jurisdiction, but this possibility is not relevant here.

We do not of course award accolades to the Railway or to the board for their handling of this case, and could we discover jurisdiction, our disposition would no doubt be different. There is of course no law that forbids the Railway from itself voluntarily reopening the case, and facing squarely up to the questions the case raises as to the adequacy of the special board procedure as actually applied.

AFFIRMED