Steve CUSACK, Petitioner,

v.

TRANS–GLOBAL SOLUTIONS, INC. successor to Econo–Rail Corp. and Sabine Contracting Corp., Respondents.

No. CIV.A. V–99–92.

United States District Court,
S.D. Texas,
Victoria Division.

Jan. 17, 2002.

Robert P Houston, John Griffin, Jr, Houston Marek and Griffin, Victoria, TX, Bobby D Brown, Law Office of Bobby D. Brown, Victoria, TX, for Steve Cusack, petitioner.

Samuel Edward Hooper, Neel Hooper & Kalmans, Houston, for Trans–Global Solutions, Inc., Successor to Econo–Rail Corp, respondent.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

RAINEY, District Judge.

This civil action was tried before the Court on September 10–11, 2001, and the Court makes the following findings and conclusions. To extent that any conclusion of law is more properly characterized as a finding of fact, or vice versa, the Court adopts it as such.

## FINDINGS OF FACT

This case was brought by Steve Cusack to enforce an award in his favor from the National Railroad Adjustment Board ("NRAB") pursuant to 49 U.S.C. § 20109 and the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* In reviewing agency decisions it is a well established rule that, "[T]he reviewing court refrains from substituting its own judgment as to the correct resolution of factual questions for that of the administrative agency. Instead, the agency's factual determination is accepted unless there is no substantial evidence in the record as a whole to support it." *Brennan v. Nat'l Hotel Co.,* 476 F.2d 17, 20 (5th Cir.1973). This is particularly true in the context of NRAB decisions, review of which is "among the narrowest known to the law." *Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 91, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978). In addition, "Once a decision has been issued, the Act forecloses relitigation of the same issue in court." *Bhd. of Locomotive Eng'rs v. St. Louis S.W. Ry.,* 757 F.2d 656, 659 (5th Cir.1985). If NRAB determinations did not have such broad preclusive effect on the parties Congress's goal of keeping these disputes out of the federal courts could not be effectuated. *Id.* Thus, in the context of reviewing NRAB findings the district court must give great deference to the Board and will review its factual determinations only to the extent necessary to determine whether or not there is evidence in the NRAB record to support them. Therefore, it is necessary for the Court to make independent factual findings only if the NRAB award cannot be supported on the NRAB record. Because the Court finds that the NRAB had sufficient evidence to support its award the Court will make only minimal factual findings:

1.) The NRAB awarded Cusack the following relief: a.) Reinstatement to service with Econo–Rail, b.) Lost wages through February 2, 1999 in the amount of $34,763.58, c.) Lost wages from February 2, 1999 to the date of Cusack's reinstatement in the amount of $365.57 per week, and d.) Interest at the rate of 6% per annum on the entire award accruing from July 2, 1999.

2.) Cusack has not yet been reinstated by Econo–Rail.

## CONCLUSIONS OF LAW

### I.   Standard of Review

There are at least four and possibly five grounds upon which an NRAB award can be set aside. Three of these grounds are specifically provided for in the statute: "For failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order." 45 U.S.C. § 153(q). The Fifth Circuit has also held that an NRAB award may be set aside if the NRAB failed to respect the parties' Due Process rights. *Atchison, Topeka & Santa Fe Ry. v. United Transp. Union,* 175 F.3d 355, 357 (5th Cir.1999). Finally, some Circuits have set aside NRAB awards on public policy grounds.

Econo–Rail argues that the NRAB did not have jurisdiction over Econo–Rail, that its award was not in conformity with the law, and that the award was based on fraudulent, perjured testimony and thus it would be against public policy to enforce it.

### II.   Jurisdiction of the NRAB

### A.   Econo–Rail's Status as a "Carrier"

Econo–Rail Corporation ("Econo–Rail") challenges the NRAB award on the grounds that Econo–Rail is not a "railroad carrier" within the meaning of the RLA and thus the NRAB had

no jurisdiction over it. The NRAB has jurisdiction only over "carriers" or "rail carriers." As defined in the act a carrier includes "any railroad subject to the jurisdiction of the Surface Transportation Board [('STB')], any express company that would have been subject to subtitle IV of Title 49, as of December 31, 1995," and any subsidiary company involved in various types of activities related to railroad transportation. 45 U.S.C. § 151. There are also certain exemptions from coverage under the RLA that are not relevant to this case. Econo-rail argues that because it is not a "common carrier" it is not subject to the RLA. The powers and jurisdiction of the STB are set out in 49 U.S.C. § 721. Section 727 adopts the definitions found in subchapter IV of Title 49. Subchapter IV defines "rail carrier" as "a person providing common carrier railroad transportation for compensation." 49 U.S.C. § 10102(5). A "common carrier" is defined as " 'one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation.' " *Kieronski v. Wyandotte Terminal R.R.*, 806 F.2d 107, 108 (6th Cir.1986) (quoting *Kelly v. Gen. Elec. Co.*, 110 F.Supp. 4, 6 (E.D.Pa.)). There does not appear to be any dispute that Econo–Rail is not a common carrier.

▮▮▮ Cusack argues, however, that Econo–Rail does not have to be a common carrier as long as Econo–Rail engages in railroad activities. Cusack points to 49 U.S.C. § 20102(2) which defines a "railroad carrier" as "a person providing railroad transportation." "Railroad" is defined broadly as "any form of nonhighway ground transportation that runs on rails or electromagnetic guideways." 49 U.S.C.

§ 20102(1)(A). Conspicuously absent from this definition is any reference to a "common carrier." In fact, common carrier language was removed from the statute in 1988 with the passage of the Railway Improvement Act ("RIA"), Pub.L. No. 100–342, 102 Stat. 624 (1988), which adopted the broader definition of railroad carrier currently found in § 20102.[1] "The purpose of the [RIA] was to continue and expand federal jurisdiction over railroad safety to include railroads that are neither common carriers nor engaged in interstate commerce," by broadening the enforcement and inspection powers of the Federal Railroad Administration ("FRA"). *Mickler v. Nimishillen & Tuscarawas Ry.*, 13 F.3d 184 (6th Cir.1993). Title 49 U.S.C. § 20109(a), the statute under which Cusack brought his NRAB complaint provides that, "A railroad carrier engaged in interstate or foreign commerce may not discharge or in any way discriminate against an employee because the employee," has reported safety violations to the FRA. The statute goes on to provide that, "A dispute, grievance, or claim arising under this section is subject to resolution under section 3 of the Railway Labor Act (45 U.S.C. § 153)." 49 U.S.C. § 20109(c). Thus, § 20109 specifically confers jurisdiction on the NRAB to resolve the type of claim asserted by Cusack. Because a railroad does not have to be a common carrier to be subject to § 20109, NRAB arbitration pursuant to § 20109 does not require a railroad employer to be a common carrier. The legislative history also indicates that Congress specifically intended to abandon the use of the term common carrier in § 20109 and adopt the broader definition of railroad found in § 20102. H.R.REP. 103–180 (1993). However, the

---

1. The RIA deleted all references to common carriers in 45 U.S.C. §§ 1 to 16 and adopted the current, more general definition of railroad. These sections were repealed in 1994,

Pub.L. No. 103–272, 108 Stat. 1379 (1994), and recodified in 49 U.S.C. § 20101 *et seq.* which maintained the broad definition of railroad.

jurisdiction of the NRAB is somewhat limited in that a railroad must be engaged in interstate or foreign commerce in order for § 20109 to apply.

The NRAB found that Econo–Rail was a carrier within the meaning § 20109. The primary evidence before the NRAB on this issue was a memo from R.J. Castiglione, an inspector for the FRA. This memo indicates that Econo–Rail maintained three locomotives at the Union Carbide Plant in Seadrift, Texas. One locomotive was used only within the Union Carbide plant, one was kept as a backup for emergencies, and one was maintained and used outside of the Union Carbide plant to receive and switch cars brought to the plant by Union Pacific. This locomotive was also used to switch cars at an additional Union Carbide plant located across state road 185. The Union Pacific line is used to service two customers. In addition the FRA concluded that it had jurisdiction over Econo–Rail's Seadrift operations on June 20, 1997 and has exercised that jurisdiction ever since. It is an old and well established doctrine that "interstate commerce" is a broad term and generally encompasses everything affecting the channels of interstate commerce, moving in interstate commerce, or utilizing the instrumentalities of interstate commerce. *See United States v. Morrison,* 529 U.S. 598, 608–09, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Econo–Rail's use of Union Pacific's rail lines is sufficient to bring it within this definition.[2] Therefore, the NRAB did have sufficient evidence before it to conclude that Econo–Rail was covered by § 20109.[3]

Econo–Rail places great emphasis on the statement in the FRA memo and a subsequent letter from the FRA that, "Econorail's operations at Seadrift have not been under the FRA's jurisdiction since Union Carbide awarded Econorail the contract in 1993." In context, however, this does not appear to be an admission by the FRA that it lacked jurisdiction over Econo–Rail prior to June 20, 1997, but is merely an acknowledgment that it had not exercised its jurisdiction up to that time because it was unaware of the nature of Econo–Rail's activities at the Seadrift facility. The NRAB could reasonably have adopted such an interpretation of this memo.

Econo–Rail's reliance on *Lone Star Steel Co. v. McGee,* 380 F.2d 640 (5th Cir.1967), is unavailing because that case dealt specifically with the railroad's status as a common carrier. As previously noted this is no longer a requirement for NRAB jurisdiction under § 20109.

**B. Cusack's Status as an "Employee"**

Econo–Rail also argues that Cusack was not its employee but instead worked for Sabine Contracting Corp. ("Sabine"). Sabine is a staff leasing company and provided all of the labor for Econo–

---

**2.** Econo–Rail does not appear to contest this, instead choosing to argue that its activities were confined to Union Carbide's property and that the evidence to the contrary is a fabrication. This issue will be addressed below.

**3.** This conclusion is bolstered by the FRA's own regulations which apply, apparently as a matter of agency discretion rather than statutory mandate, only to railroads that operate on the "general system of railroad transporta-

tion." 49 C.F.R. § 214.1; *compare* 49 C.F.R. § 213.3(b) (excluding from coverage by certain FRA regulations railroad operations confined to a private installation); *cf. White v. Indiana Harbor Belt R.R.,* 1998 WL 323621, 1998 U.S. Dist LEXIS 9074 (N.D.Ill.1998). Because the Union Pacific line on which Econo–Rail performs at least some of its operations is not leased exclusively to Econo–Rail and services multiple customers it would appear to be part of the general system of railroad transportation.

Rail's operations at the Seadrift plant. The RLA defines "employee" as "every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee" by the STB. 45 U.S.C. § 151. Econo–Rail contends that it transferred all of its Seadrift employees to Sabine and that thereafter it had no continuing power to supervise and control them. Cusack responds that the change over from Econo–Rail to Sabine was a transfer of control on paper only and that Econo–Rail employees continued to direct the day to day operations of the workers at the Seadrift plant.

The primary evidence the NRAB had before it in adopting Cusack's position was the affidavit of Patrick Feagins, the President of Sabine.[4] In his affidavit Feagins stated that:

> The newly converted Sabine employees reported to the same management personnel employed by Econo-rail. These Econo-rail personnel controlled the day to day activities of the "Sabine" employees including how long and when the employees would work, their job assignments, scheduling, and the manner and means in which the employees performed their jobs. In addition, Econo-rail provided the equipment at the work site. Econo-rail had total control over which Sabine employees could or could not work on the job site.

This was sufficient evidence for the NRAB to conclude that Cusack was an employee of Econo–Rail as that term is used in the RLA.

Econo–Rail attempts to argue that under the Texas Staff Leasing Act and the contract between Econo–Rail and Sabine, Sabine was required to maintain control over the Seadrift employees. There are two difficulties with this argument. First, it does not appear that Econo–Rail ever presented a copy of its contract with Sabine or the contract between Sabine and Cusack to the NRAB. Thus, it would be inappropriate for the Court to consider this new evidence. Second, companies do not always strictly adhere to the law and may take actions that modify or breach contracts. Even if the relevant contracts had been before the NRAB, the Board could have chosen to credit Feagins's testimony that the contracts were not enforced and that Econo–Rail maintained de facto control of the Seadrift operations. The contracts simply are not determinative of the employment issue. Finally, Econo–Rail's reliance on *Carney v. Sabine Contracting Corp.*, 914 S.W.2d 651 (Tex.App.-Amarillo 1996, *n.w.h.*), is unpersuasive. Although the state court in *Carney* did find that the plaintiff employee was an employee of Sabine under an employment contract identical to the one in this case, *Carney* did not arise out of an incident at Seadrift. In addition, *Carney* involved a state law wrongful discharge claim brought under the Texas Worker's Compensation Act and has no applicability to the present dispute.

## III. Compliance with the RLA

### A. Informal Complaints to the FRA

Econo–Rail argues that 49 U.S.C. § 20109 does not apply to this case because Cusack did not lodge a formal complaint with the FRA until after he was discharged and that informal complaints are insufficient as a matter of law under § 20109. Thus, the NRAB's award was not in compliance with the statute under which it was granted jurisdiction over Cusack's claim. However, it is a well recognized principle in other areas of the law

---

4. Econo–Rail claims that Feagins's affidavit is shot through with lies and is nothing but outright perjury. This contention will be addressed below.

that informal complaints to an employer or administrative agency can form the basis of a valid retaliation claim. *See Abramson v. William Paterson College,* 260 F.3d 265, 289 (3rd Cir.2001) (Title VII); *Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 701–02 (3rd Cir.1995) (Age Discrimination in Employment Act); *Truex v. Hearst Communications, Inc.,* 96 F.Supp.2d 652, 665–66 (S.D.Tex.2000) (Fair Labor Standards Act). In addition, laws protecting "whistleblowers" exist so that employees can report illegal or unsafe conduct by their employers without fear of reprisal or retaliation. *Haley v. Retsinas,* 138 F.3d 1245, 1250 (8th Cir.1998). These laws should be construed broadly so as to effectuate their underlying purposes. *Id.* Title 49 U.S.C. § 20101 states that, "The purpose of this chapter is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." Railroad workers, who observe and must deal with the safety practices of their employers on a daily basis, are generally in a better position to identify and report safety violations than are FRA inspectors who can perform only occasional inspections. If railroad workers who report unsafe conditions are not afforded broad legal protection from retaliation, the goals of the federal laws regulating railroad safety would be impeded.

This conclusion is bolstered in this case by the notice of termination given to Cusack by Econo–Rail. Cusack's termination notice stated that one of the reasons he was being terminated was for "reporting false conditions to EPA & FRA." It is hard to escape the conclusion that on the date Cusack was terminated Econo–Rail was aware that he had complained to the FRA and fired him specifically for that reason. Moreover, the subsequent FRA investigation into Econo–Rail's Seadrift operations "found evidence of [Econo–Rail's] non-compliance with safety regulations as [Cusack] had alleged." *NRAB*

*Opinion, Dkt. # 44671* p. 2. It would defeat the goal of § 20109 if employers who were actually aware of informal FRA complaints could preemptively terminate the complaining employees before they had an opportunity to file a formal complaint. The NRAB was correct to conclude that Cusack's informal complaints to the FRA were covered by § 20109.

## B. NRAB Transcript

■ Econo–Rail also complains that the transcript filed with the Court by the NRAB is incomplete and that therefore the NRAB award is unenforceable. Section 153(q) provides that, "The Adjustment Board shall file in the court the record of the proceedings on which it based its actions." It is, of course, an axiomatic principle of administrative law that, "[An] agency must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Obviously, if the record is seriously incomplete, or absent entirely, there may be insufficient evidence in whatever record is before the district court to support the agency's determination and the agency's decision will be set aside. But because the district court does not reweigh the evidence any deficiencies in the record will almost invariably accrue to the benefit of the party that did not prevail before the administrative agency. It would be paradoxical for the submission of additional evidence to lead to a finding that there was insufficient evidence to support the agency's decision.

■ First, Econo–Rail notes that only the first page of a letter dated May 4, 1998 from defense counsel to the NRAB was included in the record. This is the only evidence absent from the record that was actually submitted to the NRAB by

Econo–Rail. The second page of this letter was introduced at the trial of this case. Thus, this de minimis omission in no way interferes with the Court's ability to conduct a full appellate review of the NRAB's decision.

■ Second, Econo–Rail complains that certain exhibits submitted by Sabine were not included in the record. The missing Sabine exhibits are: 1.) Cusack's termination notice, 2.) A list of witnesses to Cusack's cursing and refusal to work, 3.) Two statements from Terry Jones, Cusack's supervisor, as to conduct problems he experienced with Cusack. A copy of Cusack's termination notice was in the NRAB record, however, as Cusack submitted a copy of it himself. Even assuming the rest of the Sabine exhibits were actually submitted to the NRAB by Sabine, an issue on which Econo–Rail has presented no evidence but which is open to doubt given Sabine's lackadaisical attitude to this case, they could not affect the Court's judgment. These exhibits would seem to show that Econo–Rail had legitimate reasons for firing Cusack. But it was within the NRAB's authority to believe Cusack and disbelieve all contrary witnesses and the Court has no power to substitute its judgment for that of the NRAB. *Cent. of Georgia Ry. v. United Transp. Union,* 353 F.Supp. 293 (S.D.Ga.1973).

Apparently also missing from the record is a letter from the FRA submitted to the NRAB by petitioner's counsel and a transcript of the oral presentation made by petitioner's counsel to the NRAB. Econo–Rail does not discuss how the omission of Cusack's evidence worked to the detriment of Econo–Rail.

■ However, Econo-rail argues that because the evidence presented to the NRAB by Cusack was perjured the need

to have a complete record is particularly pressing in this case. But, as will be discussed below, because the Court would have no power to set aside the NRAB's decision even if it was based on false testimony, this argument is simply irrelevant. Nor is it clear how any of the omitted evidence would have demonstrated this perjury or how the omission has prejudiced Econo–Rail. Econo–Rail has not claimed that it did not receive this evidence itself and was thereby prevented from reviewing it in preparing its case for the NRAB.[5] Finally, Econo–Rail has not shown how a supplement of the record or a remand to the NRAB would benefit it. Therefore, the Court can see no reason not to proceed on the record now before it.

Of course, this conclusion might be different if Econo–Rail's evidence had been omitted from the record and the omitted evidence so overwhelmingly and so unequivocally contradicted Cusack's evidence that the NRAB's decision would appear arbitrary or capricious. However, as previously noted the only significant evidence omitted from the record was submitted by Cusack and Sabine, parties adverse to Econo–Rail.

## IV. Public Policy

Econo–Rail devotes the majority of its brief to the proposition that the testimony of Feagins, which was the primary evidence proving that Cusack was employed by Econo–Rail rather than Sabine, was false and to enforce an award obtained by perjured testimony would violate public policy. This argument is without merit.

■ First, although some Circuits have held that an NRAB award can be set aside on public policy grounds the Fifth Circuit has refused to address this issue. *Atchi-*

---

5. Such a claim would be somewhat difficult to sustain in any event in light of Econo– Rail's decision not to appear before the arbitration board.

*son, Topeka & Santa Fe Ry.*, 175 F.3d at 358. Second, even assuming that the Fifth Circuit would recognize a public policy exception to the binding effect of NRAB decisions, fraud by a party does not fall within the scope of the public policy exception recognized by other Circuits. Most of the cases involving the public policy exception have arisen in the context of NRAB decisions to reinstate workers when there is strong evidence that the worker has or will use alcohol or narcotics while on the job. *See e.g., Union Pacific R.R. v. United Transp. Union*, 3 F.3d 255 (8th Cir. 1993); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665 (11th Cir. 1988); *N.W. Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 808 F.2d 76 (D.C.Cir. 1987). Econo–Rail has not directed the Court's attention to any case that has set aside an NRAB award because the award was obtained by perjured testimony or false evidence. In fact, some courts have reached the opposite result. In *Woodrum v. S. Ry.*, 750 F.2d 876 (11th Cir.1985), the court held that, "[T]he recantation of a witness, associated with charges by him against the side that originally proffered his testimony, even if taken as true on summary judgment ... does not suffice to establish that a board which acted in reliance on his original testimony did so outside the scope of its jurisdiction." *Id.* at 882. In the present case Feagins has not recanted. The only evidence of his falsity is the contradictory testimony of Econo–Rail's own employees. If the recantation of a witness is an insufficient basis for overturning an NRAB award, then contradictory testimony by an employee of the losing party must surely be inadequate. Additionally, the fact that two witnesses give contradictory testimony indicates that one of them is lying, but it does not demonstrate which one is false. In short, even if fraud was a valid basis for overturning an NRAB award, Econo–Rail has not proven fraud. All that Econo–Rail has demonstrated is that this case requires a credibility determination. But the proper forum in which to address the credibility and veracity of the witnesses was before the NRAB, not this Court. The NRAB has made its credibility determination and its decision is final.

Ultimately, Econo–Rail's public policy argument comes down to the claim that the NRAB decision is simply wrong. Econo–Rail had the opportunity to present its arguments as to Feagins's lack of credibility to the NRAB and declined to do so. It is now much too late to seek a second bite at the apple.

## V. Attorney's Fees

In light of this order the only remaining issue in this case is Cusack's request for attorney's fees under 45 U.S.C. § 153(p). Petitioner shall have twenty days from the date of this order to file an application for attorney's fees, if any, with the Court. Respondent shall have twenty days after the submission of any such application to respond.

## CONCLUSION

For the foregoing reasons, Petitioner's Petition to Enforce Arbitration Award of the National Arbitration Board is GRANTED.

It is so ORDERED.